[Pinkard et al. v. Allen's Adm'r et al.]

# Pinkard *et al. v.* Allen's Adm'r *et al.*

*Distribution of Proceeds of Sale of Railroad among Creditors, made under Decree of Court of Equity foreclosing Mortgage.*

1. *Distribution among creditors of fund realized from sale of debtor's property ; when erroneous.*—When a fund realized from the sale of a railroad, made under a decree in equity foreclosing a mortgage executed to secure certain bondholders of the railroad company, being insufficient to pay off the secured bonds in full, was ordered to be distributed *pro rata* among such of the bondholders as had come in and proved their claims, and after some, and before others of such bondholders had received from the register their *pro rata* share of the funds, other bondholders of the same class were allowed to come in by petition, prove their claims, and participate in the undisturbed residuum of the funds,—*held,* that this was manifestly unequal, unjust and erroneous ; that the only way by which the petitioning bondholders could be brought in, and enabled to share in the fund would be to recast the whole account and declare a diminished dividend, requiring each creditor who had been settled with, to refund *pro rata* to the register ; and that this could not be accomplished by petition.

2. *Same ; power of court to vacate interlocutory decree.*—The decree allowing the petitioning bondholders to come in, and participate in the undistributed residuum of the fund was interlocutory, and could be subsequently altered, modified or vacated ; and the decree having been made in vacation, without notice to, and without the consent of parties in adverse interest, and being improper in itself, the court, in subsequently vacating it, did not err, but only did what should have been done, with or without motion therefor.

3. *Attorney-at-law; power of court to compel payment of money into court.*—When a practicing attorney receives, as such, money or any thing else of value, by virtue of an order of court, made in a case in which he is counsel, and before he has turned the same over to his client, it is ascertained and decreed that the order has been unadvisedly and erroneously granted, it is in the power of the court to order its restoration to its former custody, and to enforce obedience to such order ; and, in such case, the presumed presence of the attorney in court renders it unnecessary to show actual notice prior to the primary order of restoration.

4. *Same.*—If, however, compulsory measures are invoked against the attorney, there should be notice, and an opportunity to show cause should be allowed him.

APPEAL from Lee Chancery Court.
Heard before Hon. N. S. GRAHAM.
The facts are sufficiently stated in the opinion.

WATTS & SON, J. M. CHILTON, H. C. LINDSEY, G. W. HOOPER and W. P. PINCKARD, for appellants.

BARNES & SON and GEO. F. MOORE, *contra.*

STONE, J.—No question is raised in this case, as to the regularity of the sale of the Savannah and Memphis railroad, sold under decree of the chancery court. The entire contest is as to the distribution of the proceeds. The transcript before us begins with the decree of the chancellor, ordering a sale of the property, which was rendered March 31st, 1880. That decree shows on its face that there had been a reference to the register, to ascertain and report who were the creditors, and the amount of their several claims. There were two classes of creditors; one having a first, and the other, a second lien. Of the first class he reported certain creditors, the aggregate amount of whose claims was $204,902. These were to be first paid. No question is raised on this class, for they were paid in full. Three creditors held all the claims falling within this class.

Of the second class, three claims were proved before the register, and he reported in their favor, as follows:

Claim of Palmer, Sibley, Hadden, Young and
  Tompkins.................... .........$ 2,734,888.20;
J. J. Norton.................... .......... 3,341.75;
Thomas Allen.................... .......... 42,774.40.

The report of the register was confirmed by the chancellor; and, in the decree of sale, among other things, after directing the payment of the expenses and the preferred claims, the chancellor ordered and decreed "that if after making said ordered payments [those to the first lien creditors], there remain still a surplus of proceeds of sale, then the said register shall pay the same out upon the amounts ascertained and found to be due on account of the seven per cent. bonds of said company [the second class] to the parties entitled thereto, or their solicitors of record, ratably and equally, till the said fund is exhausted," etc.

The register made sale of the property, June 7th, 1880, reported the sale on the 8th, and on the 12th the sale was confirmed. The property yielded a considerable surplus above what was required to pay the first lien creditors. The court was in session at each of these dates.

On the 7th day of June, 1880, the court, reciting that certain parties had filed their petitions, praying that they be allowed to file their said bonds and coupons in this court, and that they be allowed to share in the distribution of the proceeds of sale heretofore ordered in said cause, and in all funds that may be therein distributed by this court, on equal terms with, and in like manner as the other holders of the bonds of said company of like kind," proceeded to act on said petitions, and, without a reference to the register, ascertained and decreed

that there were due from the said railroad company debts of
the second class:

To Young, Palmer and Sibley. ........... ...$ 148,932.05;
 " C. S. Parnell.............................    2,866.67;
 " J. J. Lancaster..........................    2,366.40;
 " A. N. Lightfoot.........................       668.35;
 " E. R. Hampton........ .................       668.35;
 " Forney Renfro..........................       603.85;
 " J. E. Andrews...........................      603.85.

The court thereupon "ordered that each of said petitioners
should equally, ratably, and in like manner with other like
bondholders, participate in the distribution of any fund that
may arise for distribution in said cause, as if they had origi-
nally proved their claims before the master." It will be ob-
served that this decretal order was made on the very day on
which the sale took place, and, of course, before any money
was realized for distribution. The language of this order fur-
nishes additional, strong confirmation of the correctness of our
inference, that before the decree of sale, there had been a ref-
erence to ascertain and report the debts of the said railroad
company of the several classes, and to whom they were due.

Three several petitions were subsequently filed by alleged
creditors, praying that they be allowed to come in and prove
their claims of the second class, and share with the other cred-
itors in the distribution. The Enterprise Savings Bank of
Cairo, Illinois, filed its petition September 30th, 1880; J. C.
Maben filed his petition February 11th, 1881; Bonner & Co.
filed their petition February 11th, 1881. After the filing of
the first of said petitions, the chancellor, at chambers, on the
26th of October, 1880, made the following order, which was
received and filed by the register on the next day :

"It is ordered that the register retain in his hands, after
paying all preferred claims and costs allowed, as heretofore
decreed in this cause, an amount sufficient to pay the claims
above mentioned *pro rata* with the like claim or claims of the
same class, pending or allowed by the court in this case; and
this order to be of force, until the further order and direction
of the court in the premises."

At the March term, 1881, said petitions were submitted to
the chancellor, with certain proofs, for decree thereon. He
held them up for decree in vacation; and on the 14th June,
1881, he rendered his decree, which was filed by the register
on the 17th. This was in vacation. The decree declared that
the petitioners be allowed to prove their claims, as creditors of
the defendant corporation. It was referred to the register to
ascertain and report to the next term of the court " the amount
of principal and interest due on the respective claims named

and referred to in said petitions, after having given the usual notice to the parties interested, of the time and place of doing so." The register executed the reference and made his report June 29th, 1881, in which he reported there was due to J. C. Maben $4,386; to the Enterprise Savings Bank $16,082, and to G. T. Bonner & Co. $3,655. On June 30, 1881, the chancellor, at chambers, acted on said report, and made his decree. In the decree it is recited "that the parties interested in said motion have had notice of this motion, or waive further notice, and consent and agree in writing that there may be a distribution of the funds in the hands of the register," proceeds of the sale of the railroad property. The decree then confirmed the report of the register, and "further ordered and decreed that the said register proceed without delay to distribute the fund remaining in his hands growing out of the sale of the Savannah and Memphis Railroad Company, ratably between said moveants above named and set forth [the petitioning creditors], upon the basis of, and as shown by said report hereby confirmed." On this order, there was paid by the register to the solicitor of J. C. Maben, G. T. Barnes & Co., and Enterprise Savings Bank—the petitioning creditors—the sum of $1,862.85. We suppose this was done July 1st, 1881, as on that day the solicitor receiving the money entered into a written agreement with a solicitor who represented other adverse interests in the cause, that the money should be held on deposit in bank, until the next term of the court.

On Thursday, the 8th day of September, 1881—the next term of the chancery court, but after the first two days of the term had expired—other creditors of the railroad, whose claims had been regularly proved and allowed, made a motion in court to vacate and set aside the decretal order made at chambers, June 30th, 1881, confirming the register's report and ordering distribution to the petitioning creditors, on the ground, among others, that they had no notice, and had not consented that the report should be acted on in vacation. This motion was not acted on at that term, but was continued until the next term.

On the 7th day of March, 1882, during the next term, Thomas Allen, another creditor of the second class, who had proved his claim before the decree of sale was rendered, and which claim, as we have shown, was expressly provided for in that decree, filed his petition, setting forth that he had no knowledge or notice of any of the proceedings under said petitions, and praying that they be set aside and annulled.

Responding to this petition, as well as the petition of Fanny Renfro and J. E. Andrews, filed at the former term, the chancellor, on the 10th day of March, 1882, decreed that "it appearing to the satisfaction of the court that said decree of

[Pindard et al. v. Allen's Adm'r et al.]

June 30th, 1881, was rendered in vacation, and without notice to the moveants, and without the consent of the moveants, and it further appearing that said [the solicitor who had received the money], an attorney and solicitor of court, holds the sum of eighteen hundred and sixty-two 85-100 dollars, it is therefore ordered and decreed that said decree made on the 30th June, 1881, as shown by said motion on file in this court, be, and the same is hereby vacated, set aside, and held for naught. It is further ordered, adjudged and decreed that said [the attorney], as such solicitor as aforesaid, pay back into the registry of this court *instanter* the said sum of eighteen hundred and sixty-two 85-100 dollars, collected by him under said decree as aforesaid, and which he holds on deposit in bank, as shown by his agreement on file in this court."

Further explanation is necessary to a full understanding of the questions raised. When the decree of June 7th, 1880, was announced, the residuum of proceeds, after paying the first creditors in full, was sufficient to pay near twenty-seven per cent. on all the claims then proven and allowed. The first report of distribution by the register was made and filed March 7th, 1881. There was then left in the register's hands only $6,705.16. The dates of the several disbursements set forth in this report are not given. The register was authorized to pay as soon as the sale was confirmed, June 12th, 1880. The order of the chancellor to the register, directing him to retain moneys in his hands, made in consequence of the petition filed by the Enterprise Savings Bank, was made October 26th, 1880. We can not suppose that after that order was made, the register proceeded to pay out the moneys, in utter defiance of that order. If he had done so, we think the petitioning creditors would have brought that fact to the knowledge of the court. In the absence of all showing, or even averment, that the register did pay out after that date, we infer that all the disbursements made by him, shown in his report of March 7th, 1881, were made before October 26th, 1880, leaving in his hands at that time only $6,705.16. At that time, the following creditors, whose claims had been proven and allowed, had not been paid. Computing their dividends at the same rate the other creditors had been paid—near twenty-seven per cent.—the following sums remained due to them:

Thomas Allen .................................. $5,368.92 ;
J. J. Norton .................................... 503.84 ;
E. R. Hampton ................................. 83.89 ;
A. N. Lightfoot ................................ 83.89 ;
Forney Renfro .................................. 83.89 ;
J. E. Andrews .................................. 83.89.

This wanted a fraction of less than five hundred dollars of ex-

hausting the fund left in the hands of the register.  Allowing the petitioning creditors to come in and share in this undistributed residuum of $6,705, reduced the dividend to each of the remaining unpaid creditors—those stated above included—to a fraction under seventeen per cent.  This would give to each of them near forty per cent. less than  the other creditors had received.  This was manifestly unequal, unjust, and an error.  The only way by which the  petitioning creditors could have been brought in, and enabled to share in the fund, would have been to re-cast the whole  account, and declare a diminished dividend.  This, in the then condition of the case, could not be accomplished by petition.  It would have required that each creditor of the second class, who had  been settled with, should refund to the register *pro rata*.  Any thing less than this would have been a distribution of  the fund unequally between creditors of one and the same class, and of equal merit.

The record in this case entirely fails  to  show any notice to, or appearance by Thomas Allen, Forney Renfro and J. E. Andrews, or any consent that any proceedings should be had under the petitions.

It is urged for appellants that the chancellor was without authority to set aside and vacate the order of June 30th, 1881, because no application was made therefor within the first two days of the next succeeding term.  Such is  the rule when the decree is final.—Rule 80, Chancery Practice; *Ex parte Creswell*, 60 Ala. 378.  It is different, however, when the decree is only interlocutory.  In general, such decrees or order may be subsequently, even on final hearing, altered, modified, or vacated.—2 Dan. Ch. Pr. (5 Ed.) 1371 and  note 1 ;  *McLane v. Spence*, 11 Ala. 172.  The decree of June 30th, 1881, was interlocutory. It is manifest that that order was unadvisedly passed, first, because several of the creditors in adverse interest, Thomas Allen among them, had no notice of the pendency of the proceedings ; second, because it was granted in vacation, without the consent of several of the parties in adverse interest ; and third, because in the then condition of the suit, the  order was improper in itself, unless made on full consent.  The chancellor, in vacating it, did not err, but did only what he should have done, with or without motion therefor.

The remaining argument urged for a  reversal  questions the power of the court to order the solicitor to return the money to the registry of the court.  If, before proceedings were commenced to vacate the order of June 30th, 1881, the solicitor had paid the money over to his clients, there is no question that he would have stood exonerated.  It is not, however, denied, that the money is still under his control.  That being the case, it is unnecessary to scrutinize the terms of the agreement

[Pinkard et al. v. Allen's Adm'r et al.]

he made with opposing counsel, as to the custody of the money. He has money in his hands which *ex æquo et bono* belongs to another, and he has no right to retain it. No payment or use he could now make of it, other than a restoration to its rightful custody, would relieve him of liability to account for it, in an appropriate suit. Were he and the money so far within the chancellor's jurisdiction, that he could be rightfully ordered to return the money?

Attorneys and counsellors at law are not officers, in the technical, legal sense. They are not elected or appointed, as public officers are, and they are charged with no public duties. Statutes, civil or criminal, made for the government of officers, do not, without more, embrace them. Still, they are part and parcel of the judicial administration of the laws of the commonwealth. They are instrumentalities—necessary instrumentalities – in all judicial contentions. They receive their authority to represent the interests of others, not as a common or natural right, but in consideration of their ascertained legal learning, and good moral character. They thus become a part of the court's machinery ; and, although not technically public officers, they are *quasi* officers. They are called officers of the court ; that is, they are instrumentalities, to aid the court in administering the law. So much are they regarded as part of the machinery of the court, that, having business before the court, they are presumed to be present whenever the court is in session. We hold it to be clear, both in reason and authority, that when a practicing attorney receives, as such, moneys, or any thing else of value, in virtue of an order of court made in a cause in which he is counsel, and before he has turned the same over to his client, it is ascertained and decreed that the order had been unadvisedly and erroneously granted, it is in the power of the court to order its restoration to its former custody, and to enforce obedience to such order. And the presumed presence of the attorney in court renders it unnecessary to show actual notice, prior to the primary order of restoration. Of course, if compulsory measures are invoked, there should be notice, and an opportunity to show cause should be allowed the attorney.— *Wilmerdings v. Fowler*, 55 N. Y. 641 ; 1 Wait's Ac. and Def. 455 ; *Ex parte Garland*, 4 Wall. 333 ; Weeks' Att'y at Law, pp. 65, 175, 180 ; *In re Dorsey*, ·7 Por. 294, 365, 373, 393.

The decree of the chancellor is affirmed.